UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

TEVA PHARMACEUTICALS USA, INC.,

   *Plaintiff*,

 v.

BIOGEN INTERNATIONAL GMBH,

   *Defendant*.

No. 23-cv-02491 (MEF)(JRA)

**OPINION and ORDER**

**Table of Contents**

I.  **Background**
    A. **Allegations**
    B. **Procedural History**
    C. **The Motion**
    D. **The Court's Approach**
II. **The Parties' Arguments**
    A. **The Plaintiff's Claim**
    B. **The Defendant's Counterargument**
III. **Breach of Contract**
    A. **"Ordinary Meaning"**
    B. **The "Overall Scheme" and "Surplusage"**
    C. **Specific Provisions**
    D. **Conclusion**
IV. **Breach of the Implied Covenant**
V.  **Unjust Enrichment**
VI. **Conclusion**

\* \* \*

A manufacturer terminated its contract with a distributor.

The manufacturer then told the distributor not to sell off the goods it had previously bought and still had on hand.

The distributor sued, seeking damages in connection with the stranded goods it was left with.

The manufacturer now moves to dismiss.

The motion is denied in part and granted in part.

I.  **Background**

   A.  **Allegations**

The allegations as relevant for now are as follows.

A pharmaceutical company manufactured a drug[1] that another company wanted to sell as a generic.  See Complaint ¶ 1.

The two companies signed a contract ("the Contract"[2]).

Per the Contract, the manufacturer ("Manufacturer"[3]) was to sell units of the generic drug ("Drug") to the distributor ("Distributor"[4]).  See Contract § 3.1.  And the Distributor could then turn around and sell the Drugs to its customers.  See id. at §§ 2.1–2.2.

In addition, the parties' agreement gave the Manufacturer the right to put an end to the Contract.  See id. at § 10.2.

And if the Manufacturer used that right, at least in the circumstances relevant here, see id. at § 10.2(f), the Contract gave the Distributor a right of its own.  Namely, if (a) the Manufacturer terminated the Contract, then (b) the Distributor would be allowed to "sell off" the Drugs it had previously bought.  See id. at § 10.8(c)(ii).

The Manufacturer terminated the Contract.  See Complaint, Exhibit C, at 1.

But it told the Distributor not to sell off leftover Drugs, contrary to what the Contract seemed to envision.  See Complaint ¶¶ 74–80.

---

[1] Tecfidera.

[2] The Contract is Exhibit A to the Complaint.

[3] Biogen International GmbH.

[4] Teva Pharmaceuticals USA, Inc.

2

This left the Distributor with inventory stuck in limbo --- Drugs that it had bought and still had, but that it was told it could not sell.  See id. at ¶¶ 78, 80.

### B. Procedural History

In light of the above, the Distributor sued the Manufacturer.

From here, the Distributor is sometimes called "the Plaintiff," and the Manufacturer is sometimes called "the Defendant."

The Plaintiff-Distributor's core claim: it should be paid damages for the Drugs it bought but then was told it was not allowed to sell.  See id. at ¶¶ 91, 106, 117.

### C. The Motion

The Defendant-Manufacturer now moves to dismiss each of the three claims against it.  See Motion to Dismiss at 2-3.

The motion is before the Court.

### D. The Court's Approach

To assess the motion, the Court lays out the parties' arguments in some more detail, see Part II, and then analyzes them.

The Court's conclusion: the Defendant's arguments are not persuasive as to the Plaintiff's claim for breach of contract, see Part III, or its claim for breach of the implied covenant of good faith and fair dealing, see Part IV.

The Court then takes up a separate set of arguments from the Defendant, this one as to unjust enrichment.  These arguments, the Court determines, are persuasive.  See Part V.

In light of this, the Defendant's motion to dismiss is denied in part and granted in part.  See Part VI.

## II. The Parties' Arguments

### A. The Plaintiff's Claim

Take as the stepping-off point the Plaintiff-Distributor's fundamental claim: it should have been allowed to sell off in-inventory Drugs when the Defendant-Manufacturer terminated the Contract.  See Complaint ¶¶ 71-73.

In support of this, the Plaintiff points to the Contract.  "[The Distributor] shall be permitted to sell off any inventory of

3

Generic [Drugs] in its possession as of the date of termination." Contract § 10.8(c)(ii).

### B. The Defendant's Counterargument

The Defendant-Manufacturer's counterargument is as follows.

The Manufacturer suspended the Contract a few weeks before terminating it, and under the relevant suspension provision there are no Drug sell-off rights. See Motion to Dismiss at 19–20 (citing Contract § 2.13(a)(ii)).

The Manufacturer never called an end to the suspension --- so the suspension outlasted the termination (and indeed it continues even now). See id. at 19-21.

The argument continues: the still-in-place suspension (during which the Distributor has no sell-off rights) trumps the termination (after which the Distributor, in the absence of a still-live suspension, would otherwise have had sell-off rights). See id. (citing § 2.13(a)).[5]

In the final analysis, the argument goes, this means that the Plaintiff-Distributor has no viable claim for breach of contract or breach of the implied covenant of good faith and fair dealing, and the motion to dismiss must therefore be granted as to those. See id. at 14, 22.

Why?

Because the Distributor's lawsuit is premised on an invocation of its post-termination contractual sell-off rights. But those rights, per the Manufacturer, are not actually in play. Rather, the Contract, though terminated, also remains suspended --- and while it is suspended the Distributor does not have the sell-off rights that are the basis of its legal claims here.

* * *

---

[5] Another way to put the Defendant's argument. The Contract was suspended at Time 1; it was terminated at Time 2; and it remains suspended now, at Time 3. The suspension between Time 1 and Time 3 covers the Time 2 termination --- and thereby defeats any at-termination sell-off rights that might otherwise have existed under the Contract.

As is clear from the above, the premise of the Manufacturer's argument is that the suspension of the Contract outlasted its termination.

The stated basis for this argument, see id. at 15-16, is this part of the Contract:

> "**Suspension Period**" means the period commencing on the date on which [the Manufacturer] gives to [the] Distributor a Suspension Notice and ending on the date, if any, on which [the Manufacturer] gives to [the] Distributor a Reinstatement Notice with respect to such period.

Contract § 1.66 (underlining added).

Per the Manufacturer, speaking of an "end[] . . . date, if any," to a suspension period implies that there does not always need to be an "end[] . . . date" to a suspension period.

Therefore, a suspension period can outlast termination --- and here it did, it is said, because the Manufacturer has not yet put a stop to the suspension period. See Motion to Dismiss at 19-20.

Does this interpretation of the Contract work?

Take that question up in the next Part, in the Court's analysis of the Manufacturer's motion to dismiss the Distributor's breach of contract claim.

### III. Breach of Contract

As noted just above, see Part II, the Defendant-Manufacturer's interpretation of the Contract is that suspension (during which there are no sell-off rights) can run past and supersede termination (upon which there are sell-off rights).

But this interpretation is at odds with the ordinary understanding of "suspension" and "termination," see Part III.A; with the parties' fundamental bargain, as reflected in the Contract, see Part III.B; and with particular provisions of the Contract, see Part III.C.

In Part III.D, the Court takes up the implications of this for the Manufacturer's motion to dismiss the Distributor's breach of contract claim.

5

### A. "Ordinary Meaning"

Under Delaware law,[6] words in a contract generally take their "common or ordinary meaning." Sassano v. CIBC World Mkts. Corp., 948 A.2d 453, 462 (Del. Ch. 2008) (cleaned up). To suss out that meaning, Delaware courts often look to dictionaries. See, e.g., Stream TV Networks, Inc. v. SeeCubic, Inc., 279 A.3d 323, 339 (Del. 2022).

Dictionaries are clear: suspension is a way station; termination is an end point. Compare Suspension, N., sense I.2.a, Oxford English Dictionary ("The action of stopping or condition of being stopped, esp. for a time; temporary cessation, intermission; temporary abrogation (of a law, rule)."); Suspension, N., sense 1.c, Merriam-Webster's Unabridged Dictionary ("temporary remission of action"); Suspension, N., sense 1, Collins Dictionary ("The suspension of something is the act of delaying or stopping it for a while or until a decision is made about it.") (cleaned up), with Termination, N., sense I.2.a, Oxford English Dictionary ("The action of putting an end to something or of bringing something to a close."); Termination, N., sense 4, Merriam-Webster's Unabridged Dictionary ("the act of terminating: act of setting bounds or bringing to an end or concluding"); Termination, N., sense 1, Collins Dictionary ("the end of something in space or time; limit, bound, conclusion, or finish").

And the "temporary cessation" of something (which is what "suspension" is, see Suspension, Oxford English Dictionary) is superseded by that same thing being "br[ought] . . . to a close" (which is what "termination" is, see Termination, Oxford English Dictionary).

These dictionary understandings match up with everyday language.

The intermission (which temporarily stops the play) does not keep going after the final curtain has dropped. Morning recess (which is a break from class) can run long or short --- but it can never run past the last bell that dismisses school for the day.

And other examples are to the same effect. The end of a war takes the place of a suspension of hostilities. An employee who

---

[6] The parties assume that Delaware law controls, compare Motion to Dismiss at 1 with Opposition to Motion to Dismiss at 2, and so it does. See Navigators Specialty Ins. Co. v. Citizens Ins. Co. of Am., ___ F. Supp. 3d ___, ___, 2024 WL 3287848, at *2 (D.N.J. July 3, 2024) (collecting cases).

is terminated (because he stole from the company) is no longer suspended (as he had been while the theft was being investigated).

The law works in this same way, too.

The Constitution, for example, allows Congress to "suspend[]" the writ of habeas corpus. See Hamdi v. Rumsfeld, 542 U.S. 507, 525 (2004) (citing U.S. Const. art. I, § 9, cl. 2). But this does not mean that the Constitution allows endless suspension --- because that would be the same as terminating the writ, and suspension, to be suspension, must always pull up short of termination. See, e.g., Dep't of Homeland Sec. v. Thuraissigiam, 591 U.S. 103, 145 (2020) (Thomas, J., concurring) ("At the founding, suspension was a well-known term that meant 'a temporal stop of a man's right.'") (cleaned up) (citing N. Bailey, An Universal Etymological English Dictionary (22d ed. 1770)).

But the Manufacturer's interpretation of the Contract defies all of the above.

It is grounded on the idea that suspension can outlast termination. But that is not how things generally work. And that is not "ordinary" English. Sassano, 948 A.2d at 462.

Per the Delaware Supreme Court, a "contract's construction should be that which would be understood by an objective, reasonable third party." Cox Commc'ns, Inc. v. T-Mobile US, Inc., 273 A.3d 752, 760 (Del. 2022) (citation omitted).

But it is hard to see the Manufacturer's proposed "construction" as one that "an objective, reasonable third party" would land on. The Manufacturer's interpretation would allow a suspension to keep going after a termination. But this seems to have it wrong. A termination is not a speed bump that a suspension can roll through. A termination is the end of the road --- and it therefore puts a stop to any earlier suspension.

### B. The "Overall Scheme" and "Surplusage"

To see the second problem with the Defendant's argument, step back for a moment.

"Often enough, the basic purpose of a contract is to allow someone to credibly commit to give something up." Stabile v. Macy's, Inc., ___ F. Supp. 3d ___, ___, 2024 WL 4315044, at *7 (D.N.J. Sept. 27, 2024). "[A] manufacturer might agree to give up steel, or a utility to give up a supply of electricity --- all in return for some cash." Id. at *8.

7

In many commercial contexts, the seller "give[s] something up" with no strings attached. The buyer can use the steel to build a car or to reinforce a roof. Her choice. The electricity can power a drill or heat a pool --- and it does not matter to the utility which it is.

But sometimes conditions are imposed. For example, a soda manufacturer might sell its cans to a distributor, but then require that they be re-sold only in New Jersey, but not in New York.[7]

A strings-attached manufacturer-distributor agreement is essentially what was agreed to here.

The Manufacturer and the Distributor agreed on limits to sales of the Drugs. Territorial limits, as in the soda example. See Contract §§ 1.69, 2.1. And also temporal limits --- under the Contract, at certain times (during suspension) the Manufacturer could say to the Distributor "no distributing." See id. at § 2.13(a)(ii).[8]

This arrangement presented an obvious risk to the Distributor --- of a suspension being called, and being left with a line out the door of disappointed customers who were expecting to receive the Drug.

A protection was built into the Contract to address this possibility. See id. at § 2.13(b) (describing "Distributor Failure to Supply Penalties" --- essentially reimbursements by the Manufacturer to the Distributor for counter-party penalties incurred by the Distributor for not going through with Drug deliveries).

But there was an even larger potential risk to the Distributor's re-sales of the Drugs: termination of the Contract that allowed it to get the Drugs from the Manufacturer in the first place.

---

[7] There are any number of reasons to do this. For example, a tightened distribution area may potentially improve customer service, and thereby help with what the law sometimes calls "intrabrand" strengthening. See generally Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1615(b) (Sep. 2024).

[8] This limit was apparently a plus for the Manufacturer. It seemingly allowed the Manufacturer, when it wanted, to dial back on the competition between (a) its own sales of the branded version of the Drug, see id. at § 2.6(b), and (b) the Distributor's sales of the generic version of the Drug. Cf. id. at §§ 1.11, 2.6.

8

Under the Contract, these risks to the Distributor were managed in different ways. Consider the main two.

In some contexts, the Manufacturer was allowed to terminate the Contract because of events that made the Distributor a markedly less suitable business partner --- a bankruptcy, a material breach of the Agreement, non-performance, an unwelcome change of control. See id. at § 10.2(a)-(c), (e).

In those circumstances, the Distributor had made its own bed, and under the Contract would have to lie in it --- the Distributor would be unable to sell off the Drugs it had bought from the Manufacturer, even though they were sitting in inventory. See id. at § 10.8(b)(i).

But termination could also happen for another sort of reason entirely --- simply because the Manufacturer wanted to put an end to things. See id. at § 10.2(f).

The possibility of this kind of at-will termination plainly presented an especially large risk to the Distributor.

The Distributor might be able to control whether it performed well under the Contract, or stayed away from bankruptcy. But it could not hope to control the Manufacturer's will, to curb a no-need-to-explain-why desire on the Manufacturer's part to end the Contract.

In the face of this especially large risk to the Distributor, of at-will termination by the Manufacturer, the Contract folded an especially strong protection into the mix. Namely, the Distributor would not be stuck with the Drugs it had bought and had on hand. It would be allowed to sell them off. See id. at § 10.8(c)(ii).[9]

\* \* \*

---

[9] Contractual sell-off rights are not uncommon in the distribution context. For a recent case in which sell-off rights are discussed, see Flawless Style LLC v. Saadia Grp. LLC, 2023 WL 3687782 (S.D.N.Y. May 26, 2023). And for more examples, look to model distribution contracts, some of which include sell-off rights. See e.g., Distribution Agreement (Pro-Supplier), Practical Law Standard Document 2-520-3379 at ¶ 12.04; Distribution Agreement (Pro-Distributor), Practical Law Standard Document 2-575-2206 at ¶ 12.04. (At least one court has read sell-off rights into a contract that seems to say nothing about them. See Upper Deck Authenticated, Ltd. v. CPG Direct, 971 F. Supp. 1337, 1342 (S.D. Cal. 1997).)

The overall structure set out above appears to be carefully constructed.  The Contract's relevant provisions, see id. at §§ 3.5, 10.8, 10.9, are detailed, and are presumably the surface indications of a negotiated give-and-take between the parties.

But the parties' core business deal would be badly eroded if one side could simply decide, on its own, to skirt the agreed-upon approach to termination.

And "an objective, reasonable third party," Cox Commc'ns, Inc., 273 A.3d at 760, could conclude that that is what the Defendant-Manufacturer's interpretation of the Contract would accomplish.

The Distributor is entitled to sell-off rights as to accumulated Drug inventory, see Contract § 10.8(c)(ii), when, as here, see id. at § 10.2(f); Complaint, Exhibit C, at 1, the Manufacturer opts for an at-will termination.

But the Manufacturer's interpretation of the Contract would allow it to dodge the Distributor's sell-off protections --- unilaterally and with no fuss, simply by announcing an assertedly limitless suspension of the Contract just before terminating it.

Moreover, the Contract plainly seems to envision a fine balance between risks and protections.

A medium-sized risk for the Distributor (a suspension of its ability to sell) gets medium-strength protection (mainly: payment by the Manufacturer of penalties imposed by the Distributor's counter-parties).  See Contract § 2.13(b)-(c).

And a large-sized risk for the Distributor (being left with unsold inventory at termination because the Manufacturer simply wants to terminate) gets stronger protection (mainly: sell-off rights).  See id. at § 10.8(c)(ii)-(iii).

But the Manufacturer's interpretation of the Contract would undo this.  It would leave the Distributor with the less robust protection (associated with suspension) in the face of the bigger risk materializing (being left with unsold Drugs in inventory after an at-will Manufacturer termination).

This would seem to be at odds with Delaware law, which generally favors contract interpretations that honor the basic bargain struck by the contracting parties.  See E.I. du Pont de Nemours & Co. Inc. v. Shell Oil Co., 498 A.2d 1108, 1114 (Del. 1985) ("[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan."); accord, e.g., Ray Beyond Corp. v. Trimaran

Fund Mgmt., L.L.C., 2019 WL 366614, at *5 (Del. Ch. Jan. 29, 2019); Stemerman v. Ackerman, 184 A.2d 28, 34 (Del. Ch. 1962); see also Matter of Kazmierczak, 24 F.3d 1020, 1022 (7th Cir. 1994) ("a proposed contractual interpretation that would read out of a contract language obviously important to one of the parties faces and ought to face a distinctly uphill struggle for judicial acceptance").

And all of this would seem to be at odds with Delaware law in another way, too.

Per the Delaware Supreme Court: "we will give each provision and term effect, so as not to render any part of the contract mere surplusage." Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010) (cleared up).

If suspension could extend past termination, whole areas of the Contract would seem to be unnecessary (or perhaps just not especially sensible --- also a problem under Delaware law, see, e.g., Energy Partners, Ltd. v. Stone Energy Corp., 2006 WL 2947483, at *13 (Del. Ch. Oct. 11, 2006)); NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC, 948 A.2d 411, 419 (Del. Ch. 2007), aff'd, 945 A.2d 594 (Del. 2008)).

For example, during suspension, the Contract requires the Distributor to use "[c]ommercially [r]easonable [e]fforts" to "retain business from [its] customers." See Contract § 2.13(b); see also id. at § 2.13(c) ("[c]ommercially [r]easonable [e]fforts" during suspension to sell "[s]hort-[d]ated [p]roduct").

But such a provision makes little sense after termination --- because termination cancels the Distributor's orders from the Manufacturer for more Drugs, see id. at § 10.8(c)(i), and without any Drug supply it is hard to see how the Distributor could "retain business from [its] customers." Id. at § 2.13(b).

Or another example: during suspension, the Contract requires the Distributor and the Manufacturer to work closely together "in good faith" to make changes to their shared plans --- tweaking orders the Distributor had already placed with the Manufacturer for future delivery of Drugs, and revising the Distributor's forecasts for Drug orders it was planning to place over the coming 18 months. See id. at § 2.13(c); see generally id. at § 4.2.

But why require this sort of "discuss[ion]" as to the future, id. at § 2.13(c), if the Contract has been terminated? The parties' relationship is over. And there is no reason to talk

11

through the fate of future orders --- those have been cancelled. See id. at § 10.8(c)(i).

And more: why establish different sorts of protections for the Distributor at termination based on the broader factual circumstances in play if those can all be collapsed down to the lowest common denominator (no sell-off rights) on the Manufacturer's say so?

And finally and most fundamentally: why would sell-off rights have been included at all in the Contract for an at-will termination if an endless suspension period could void them, just like that?

### C. Specific Provisions

A third problem with the Defendant-Manufacturer's interpretation: "an objective, reasonable third party," Cox Commc'ns, Inc., 273 A.3d at 760, could view it as running aground on any number of specific provisions of the Contract.

Some examples, in addition to the ones already discussed.

First, the Contract says that the Manufacturer "may suspend . . . [the Distributor's] right to Distribute . . . without terminating this [Contract]."  Contract ¶ 2.13(a) (emphasis added).

But it says nothing about the Manufacturer suspending distribution rights "w[hile] terminating this Contract."  And that is what the Manufacturer seeks to do here.  See generally Fortis Advisors LLC v. Shire US Holdings, Inc., 2017 WL 3420751, at *8 (Del. Ch. Aug. 9, 2017) (recognizing, in the contract-law context, the "canon of construction expresio unius est exclusio alterius" --- under which the expression of one power is taken to exclude another, unmentioned power).

Second, the Contract spells out those provisions that "shall survive the . . . termination of this [Contract]."  See Contract § 10.10.  But the suspension section is not listed as one of the things that can "survive . . . termination."

Third, the Contract says the Distributor "shall be permitted to sell off any inventory of Generic [Drugs] in its possession as of the date of termination."  Id. at § 10.8(c)(ii).

"[S]hall" is a command.  It supports the conclusion that the Distributor's sell-off rights at termination are mandatory and automatic --- and therefore cannot be overridden by, for

12

example, the Manufacturer's decision to proclaim an assertedly endless suspension.

All of this, "an objective, reasonable third party," Cox Commc'ns, Inc., 273 A.3d at 760, could conclude, outweighs the Manufacturer's argument, which, as noted, hangs on two words ("if any") in the Contract:

> "**Suspension Period**" means the period commencing on the date on which [the Manufacturer] gives to [the] Distributor a Suspension Notice and ending on the date, if any, on which [the Manufacturer] gives to [the] Distributor a Reinstatement Notice with respect to such period.

Contract § 1.66 (underlining added).

And in any event, "if any" does not seem to prove very much here.

This implies that a suspension period may not end for one stated reason: because a "[r]einstatement [n]otice" has not been given. But that says little about whether a suspension period can end for another reason --- such as the necessary cut-off of suspension by termination. See Part III.A (noting that suspension is generally understood to be cut off by termination).

### D. Conclusion

A quick review of where things stand.

The Manufacturer's motion to dismiss the Distributor's breach of contract claim rests on an interpretation of the Contract under which suspension can outlast termination. See Part II.B.

But this interpretation is out of step with everyday understandings of "suspension" and "termination," see Part III.A; with the parties' basic agreement, see Part III.B; and with various provisions of the Contract, see Part III.C.

All of this suggests the Manufacturer's interpretation of the Contract may well be wrong. And if that were the case, its motion would plainly have to be denied. After all, a party cannot secure the dismissal of a breach of contract claim based on an erroneous interpretation of the relevant part of the Contract.

But that goes further than is necessary for now.

13

The catalog of difficulties with the Manufacturer's interpretation, see Part III.A-C, establishes, at a minimum, that its interpretation is not unambiguously correct. See VLIW Tech., LLC v. Hewlett-Packard Co., 840 A.2d 606, 615 (Del. 2003); Kaiser Aluminum Corp. v. Matheson, 681 A.2d 392, 395 (Del. 1996); Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co., 616 A.2d 1192, 1196 (Del. 1992).

And "[a] motion to dismiss must be denied when the contract provisions at issue are ambiguous. This is because ambiguous terms are interpreted by the jury, unambiguous ones by the court." IKB Int'l S.A. v. Wilmington Tr. Co., 774 F. App'x 719, 724 (3d Cir. 2019) (cleaned up).

## IV.  **Breach of the Implied Covenant**

The Plaintiff's next claim is for breach of the implied covenant of good faith and fair dealing, advanced in the alternative to its breach of contract claim, see Fed. R. Civ. P. 8(d)(2), and based on the same underlying allegations.

This is, for the Plaintiff, a backstop claim.

A court or a jury might not ultimately determine that the Plaintiff should prevail on its breach of contract claim, perhaps because it finds the precise written terms of the Contract have not been violated.

But based on the same arguments that support the breach of contract claim, the same court or jury might potentially think the Plaintiff should win on its implied covenant claim.

The reason: under Delaware law, such claims do not depend quite so much on the Contract's strict words, and rest instead on the idea that "a party in a contractual relationship [must] refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the contract." Wilgus v. Salt Pond Inv. Co., 498 A.2d 151, 159 (Del. Ch. 1985) (cleaned up).

Here, a good deal of the breach of contract analysis zeroes in on possible "unreasonable conduct" by the Manufacturer. See, e.g., Part III.B. That same analysis defeats the Manufacturer's motion to dismiss the Distributor's claim for breach of the implied covenant.

A number of cases applying Delaware law support the conclusion that claims for breach of contract and breach of the implied covenant can both survive a motion to dismiss. See, e.g., eCommerce Indus., Inc. v. MWA Intel., Inc., 2013 WL 5621678, at

14

\*36, \*56 (Del. Ch. Sept. 30, 2013); Clean Harbors, Inc. v. Safety-Kleen, Inc., 2011 WL 6793718, at \*7-9 (Del. Ch. Dec. 9, 2011); Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC, 2009 WL 1124451, at \*7-8 (Del. Ch. Apr. 20, 2009); Philip A. Templeton, M.D., P.A. v. EmCare, Inc., 868 F. Supp. 2d 333, 340 (D. Del. 2012). And these are not undermined by the cases the Defendant has cited.

Therefore, the motion to dismiss the implied covenant claim is denied.

### V. Unjust Enrichment

The Distributor's final claim is for unjust enrichment. See Complaint ¶¶ 112-17.

But under Delaware law, such a claim can work only in "the absence of a remedy provided by law." Nemec v. Shrader, 991 A.2d 1120, 1130 (Del. 2010) (citations omitted).

Here, such a remedy is available --- contractual damages, as sought by the Distributor. See Complaint ¶¶ 84-91; see generally RCS Creditor Tr. v. Schorsch, 2018 WL 1640169, at \*7 (Del. Ch. Apr. 5, 2018) (where "a contract already governs the relevant relationship between the parties . . . , any claim of unjust enrichment will be denied") (cleaned up).

The Distributor counters with cases, but these are not on point. See Opposition to Motion to Dismiss at 29-30. The most arguably on point of them apply another body of law, see Breakaway Sols., Inc. v. Morgan Stanley & Co. Inc., 2004 WL 1949300, at \*14 (Del. Ch. Aug. 27, 2004) (New York law), or focus on a situation in which there was "no contract" between the plaintiff and certain defendants. See MIG Invs. LLC v. Aetrex Worldwide, Inc., 852 F. Supp. 2d 493, 513 (D. Del. 2012).

That leaves the Distributor's last argument: that the unjust enrichment claim can go forward because the Contract, having been terminated, no longer exists. See Opposition to Motion to Dismiss at 30. But the question under Delaware law is not whether the contract has been terminated. It is whether the alleged wrong "arises from a relationship governed by contract." Nemec, 991 A.2d at 1130 (emphasis added). When it does, "Delaware courts have consistently refused to permit a claim for unjust enrichment." Id. (cleaned up). And all the more so here, where the contract was "negotiated by sophisticated parties." BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp., 2009 WL 264088, at \*8 (Del. Ch. Feb. 3, 2009).

15

## VI. Conclusion

The motion to dismiss is denied as to the breach of contract claim and the breach of the implied covenant claim. It is granted as to the unjust enrichment claim.

IT IS on this 11th day of October, 2024, **SO ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.